United States District Court
Northern District of California

**NOT FOR CITATION**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>　　　　Plaintiff,<br>　v.<br>RAMONT DARLYE JOHNSON,<br>　　　　Defendant. | Case No. 18-cr-00031-JSW-1<br><br>**ORDER DENYING MOTION TO SUPPRESS EVIDENCE**<br><br>Re: Dkt. No. 20 |

Now before the Court is the motion to suppress evidence filed by Ramont Darlye Johnson ("Mr. Johnson"). The Court has considered the parties' papers, relevant legal authority, and the record in this case, and the Court finds the motion does not require an evidentiary hearing and can be resolved on the papers. The Court CONVERTS the hearing scheduled for June 12, 2018 to a status conference, and it HEREBY DENIES Mr. Johnson's motion.

**BACKGROUND**

On January 25, 2018, the Government filed an indictment charging Mr. Johnson with one count of felon in possession of a firearm and ammunition in violation of 18 U.S.C. section 922(g)(1). These charges stem from Mr. Johnson's arrest on December 16, 2017. On that day, a woman, S.J., called the Oakland police department and reported that a man dressed in all black had a gun, was at a deli in West Oakland across the street from the BART station, and stated he was harassing her. The 911 operator asked for an address. S.J. reported she did not know but she was at 7th and Center. (Declaration of FBI Special Agent Richard Harvey, ¶ 3, Ex. A (CD-ROM, Clip 1 at 00:00-00:24[1]); *see also* Declaration of Madeline Larsen ("Larsen Decl."), ¶ 2.)

---

[1] The Court has used the timer on its computer to demarcate the location of citations of the recordings of the 911 call and radio dispatches.

In response to the operator's inquiries, SJ reported that the man was not alone, was black, dark skin, about 5' 10", was wearing a black hat, black pants, black shoes, looked to be about 25 or 30 years old, and was skinny. (Clip 1 at 00:24-00:48.) When the operator asked S.J. where the gun was, S.J. responded: "I don't know. Probably his car or his pocket." (*Id.* at 00:50-00:56.) The operator asked what made S.J. think the man had a gun and asked if she had seen it. S.J. responded: "Because I seen him reach under his jacket and threaten me. And I think he told me he was going to knock [unintelligible] out." (*Id.* at 00:57-01:04.) The operator then said: "Okay, so you never saw a weapon." S.J. continued: "and kill me ... [unintelligible] and he went under [unintelligible] and I'm assuming he had to have a gun on him. I'm not taking my life lightly in West Oakland."[2] (*Id.* at 01:05-01:18.)

The operator then said: "So he reached under his seat, but you never saw anything." (*Id.* at 01:20-01:23.) S.J. responded: "I saw, I saw the tip of a black handle, I don't know what it was exactly." (*Id.* at 01:23-01:27.) The operator said: "So you saw the handle of the gun." S.J. responded: "Umm hmm." (*Id.* at 01:27-01:31.) The operator also asked what kind of car the man was in, and S.J. responded she did not know. (Harvey Decl., Ex. A (CD-ROM, Clip 2 at 00:00-00:03).) The operator then asked for clarification about where S.J. had seen the man pull the gun. S.J. responded: "He pulled it like it was in his pants." (*Id.* at 00:14-00:20.) S.J. also verified that it was "in the front" and again mentioned that the man had threatened her. (*Id.* at 00:28-00:48.) When the operator asked S.J. if she was in the area to meet with officers, S.J. responded she was by herself and could meet them back at the deli because she was around the corner. (*Id.* at 00:50-01:15.)

Oakland police officers Kevin Yoo ("Officer Yoo") and Officer D. Brantley ("Officer Brantley") were on patrol and received a radio dispatch call for a "Code 7 suspect on scene, 7 at Center." A "Code 7" is a term used by police to refer to a gun. (Harvey Decl., ¶¶ 3-4, Ex. A (CD-ROM, Clip 3 at 00:28-00:32); Larsen Decl., ¶ 4, Ex. A (CAD Report at 1).) The operator told the

---

[2] The Government has not put forth any evidence to suggest the area where Mr. Johnson was arrested could be considered a "high crime" area, and the Court expresses no opinion on that issue. It simply is quoting S.J.'s statement.

officers that the suspect was black male, 5'10", thin build, dark complexion, between 25-35 years old, wearing a black hat, black jacket, black pants, and black shoes and stated the "RP saw the handle of a gun … didn't see the entire thing … he just pulled it from the front of his pants." The operator also stated the suspect would be on scene with a group of people. (Clip 3 at 00:32-00:48); CAD Report at 1; Declaration of Jerome Matthews ("Matthews Decl."), ¶ 2, Ex. A (Police Report at 3); Declaration of Officer Kevin Yoo ("Yoo Decl."), ¶ 3.) The operator did not advise the officers of S.J.'s report that the man had threatened her.

Officers Yoo and Brantley, along with at least three other members of the Oakland police department, "staged" at 7th Street and Market Streets and established a "DAT." (Police Report at 1; Yoo Decl., ¶ 4, Ex. A (CD-ROM, Clip 1, PDRD[3] footage of staging area).)[4] The PDRD footage shows one officer loading a rifle. The officers the proceeded to try and locate the suspect, asking the dispatch officer whether he was in front of the convenience store or across the street. The dispatcher clarified his location and also stated that the black hat had a white logo. (Yoo Decl., Ex. A (Clip 2, PDRD footage at 20:53:42-20:54:15).)[5]

Although S.J. stated to the 911 operator that the man she saw was with other people, when

---

[3] PDRD is an acronym for a portable digital recording device. (*See* Yoo Decl., ¶ 4.)

[4] There are three video clips on Exhibit A to the Yoo declaration. From top to bottom of the list, the Court identifies them as Clips 1, 2, and 3. The majority of Clip 2 involves Officer Yoo's interaction with Mr. Haley.

[5] According to the CAD Report, at some point Officer Yoo attempted to call S.J. for additional details, but she did not answer his call. Those events do not appear to have been captured on the PDRD footage. The police dispatcher also attempted to call S.J. on the number she had provided without success. (CAD Report at entries timed between 12:24:35 and 12:28:39.) The CAD report also indicates that the communication center's ALI (Automated Location Information) system captured another number. The dispatcher tried that number, and the call was routed to a voicemail box that was full. (*Id.*) Ms. Larsen, an investigator for the Federal Public Defender, attests that she conducted a search of available databases for S.J. and was not able to match S.J.'s name with the phone number she provided to the Oakland Police Department on December 16, 2017. (Larsen Decl., ¶ 2.) Ms. Larsen further attests that number belongs to a Latino man with the initials A.H., who informed Ms. Larsen he has had that number for eight years, does not know anyone named S.J., and was not familiar with the events giving rise to this case. (*Id.* ¶ 3.)

1  Officers Yoo and Brantley arrived at 7th and Center Streets, they saw an individual, later
2  identified as Mr. Johnson, who matched the description provided by dispatch. Mr. Johnson was
3  with another man who was wearing a blue jacket and dark grey jeans.[6] (Yoo Decl., ¶ 3; Police
4  Report at 4; Yoo Decl., Ex. A (PDRD footage Clip 1 at 20:54:53-20:55:02.) In his police report,
5  Officer Yoo states that the officers "parked [their] vehicles in the middle of the street [and]
6  conducted a high risk stop." (Police Report at 3.) Officer Yoo exited his vehicle, pointed his gun
7  slightly downward, and stated "get your hands up." (Yoo Decl., Ex. A (PDRD footage, Clip 1 at
8  20:54:43-20:54:53).) Based on the PDRD footage, various officers continued to tell Mr. Johnson
9  to keep his hands in the air and to walk backward. The PDRD footage shows that Mr. Johnson did
10 comply with those directions, although one of the officers told Mr. Johnson his hands needed to be
11 higher and stated "your elbows ain't broke." (*See id.* at 20:54:53-20:55:37.) Mr. Johnson was
12 directed to get down on his knees, and he complied. (*Id.* at 20:55:37-20:55:50.)

13 Officer Brantley placed Mr. Johnson in handcuffs, who inquired why he was being pulled
14 over. (*Id.* at 20:55:50-20:56:25.) Officer Brantley then conducted a pat-down search, starting at
15 Mr. Johnson's front waistband and retrieved a firearm. (*Id.* at 20:56:25-20:56:38.) Mr. Johnson
16 continued to ask why he was being pulled over and stated "I ain't did s*** to nobody." (*Id.* at
17 20:56:38-20:57:01.) The officers then put Mr. Johnson in a vehicle and re-located to a parking lot.

18 Officer Yoo conducted a records check and discovered that Mr. Johnson had a prior
19 conviction for a felony. (Police Report at 4.) Officer Iniguez "admonished Johnson" and,
20 according to the police report, Mr. Johnson "spontaneously stated that he had a gun in his
21 possession." (*Id.*)

22 **ANALYSIS**

23 Mr. Johnson argues that the stop and subsequent search and seizure violated his rights
24 under the Fourth Amendment and moves to suppress all evidence obtained as a result of the search

---

[6] Officer Yoo directed the other man to walk backwards slowly, to stop, and to drop to his knees. Officer Yoo placed the man in handcuffs, and he and another officer conducted a pat down search, but did not find any guns him. (Matthews Decl., Ex. C (Yoo PDRD footage at 20:57:00-20:59:43.) The officers released the man after they discovered he did not have any outstanding warrants.

4

and seizure. Specifically, Mr. Johnson argues that the stop amounted to a *de facto* arrest unsupported by probable cause. Mr. Johnson also argues that even if the stop did not amount to an arrest, the officers did not have reasonable, articulable suspicion to stop and frisk him because the information provided in the 911 call was not reliable.

The Government argues that the officers conducted a valid *Terry*[7] stop and frisk based on the 911 call, which it contends is reliable. The Government does not contend that the officers had probable cause to arrest Mr. Johnson before they found the gun. (*See* Sur-reply Brief at 3:21-23.)

**A. The Court Denies the Motion.**

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated . . . ." U.S. Const. amend. IV. It is undisputed that the officers did not have a warrant to search or to arrest Mr. Johnson. In general, a search conducted without a warrant is considered unreasonable, unless it is justified by an exception. "Because warrantless searches and seizures are per se unreasonable, the government bears the burden of showing that a warrantless search or seizure falls within an exception to the Fourth Amendment's warrant requirement." *United States v. Cervantes*, 703 F.3d 1134, 1141 (9th Cir. 2012).

**1. The Officers Actions' Did Not Amount to a *De Facto* Arrest.**

Mr. Johnson argues the officers engaged in a *de facto* arrest rather than a *Terry* stop. There is "no bright-line rule to determine when an investigatory stop becomes an arrest." *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996). The inquiry is fact-specific, and the Court must consider the totality of the circumstances. *Id.* As part of that evaluation, the Court considers "the intrusiveness of the stop, i.e., the aggressiveness of the police methods and how much the [defendant's] liberty was restricted." *Id.*; *accord United States v. Edwards*, 761 F.3d 977, 981 (9th Cir. 2014). This inquiry evaluates the situation from the perspective of the person who has been seized. *Edwards,* 761 F.3d at 981. If the level of intrusiveness would "cause a reasonable person to feel that he or she will not be free to leave after brief questioning" an investigatory stop may be

---

[7] *Terry v. Ohio*, 392 U.S. 1 (1968).

5

converted to an arrest. *United States v. Guzman-Padilla*, 573 F.3d 865, 884 (9th Cir. 2009).

The Court also must consider "the justification for the use of such tactics, i.e., whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken." *Washington*, 98 F.3d at 1185. This inquiry evaluates the situation from the perspective of the law enforcement officers. *Edwards*, 761 F.3d at 981. On this issue, the Ninth Circuit's cases

> make clear that [it has] only allowed the use of especially intrusive means of effecting a stop in special circumstances, such as 1) where the suspect is uncooperative or takes action at the scene that raises a reasonable possibility of danger or flight; 2) where the police have information that the suspect is currently armed; 3) where the stop closely follows a violent crime; and 4) where the police have information that a crime that may involve violence is about to occur. … [S]ome combination of these factors may also justify the use of aggressive police action without causing an investigatory stop to turn into an arrest.

*Washington*, 98 F.3d at 1189; *see also United States v. Miles*, 247 F.3d 1009, 1013 (9th Cir. 2001) (intrusive means to effectuate a stop may be used where "where the police have information that the suspect is currently armed *or* the stop closely follows a violence crime") (emphasis added). The Court may also consider the specificity of the information that an officer has that "the individuals they intend to question are the actual suspects being sought" and whether those individuals are likely to resist questioning. *Id.* at 1189-90.

In *Washington*, a police officer saw two black men whom he believed fit the description of men suspected of a series of robberies, and he followed them to their hotel. At that point, three to four police cars and between four to seven officers, with weapons drawn, stopped the men, handcuffed them, and subsequently placed them in police cars. *Id.* at 1184. The men were compliant at all times, and the record showed they did not, in fact, match the descriptions of the men suspected of the robberies. *Id.* The men filed suit under 42 U.S.C. section 1983, and the district court denied a motion for summary judgment, concluding that the stop amounted to a *de facto* arrest that was not supported by probable cause. *Id.* The Ninth Circuit affirmed, reasoning that the men "did nothing immediately prior to or during their confrontation with the police to justify" the use of the aggressive tactics, the officers had "no *specific* information that either" man was armed, no violent crime occurred shortly before the stop, and there were no "specific

similarities between the [men] and the suspects sought[.]" *Id.* at 1190 (emphasis in original).

In *Edwards*, the police received a 911 call from an unidentified male who stated that a "young black male … was shooting at passing cars, including the caller's." 761 F.3d at 980. The caller also provided a specific location for the suspect, details about his physical appearance and age, and some information about the gun. Four officers responded to the location shortly thereafter and saw two men, only one of whom, the defendant, matched the description of the shooter. *Id.* All of the officers drew their weapons as they approached the men and directed both men to kneel down. One of the officers handcuffed the defendant, performed a frisk, and located a silver revolver. Although the officers attempted to contact the anonymous caller, he had left the scene and "did not want to be involved with the case." *Id.*

The defendant moved to suppress the gun and argued that he had been arrested without probable cause. The Ninth Circuit rejected his argument. *Id.* at 981-82. The court stated "there is no doubt that the police were intrusive in stopping" the defendant. *Id.* at 981. However, the defendant was the only person in the vicinity who matched the shooter's description "and therefore could be armed and dangerous, possibly having just committed a violent crime." *Id.* The court determined "the officers' aggressive conduct was reasonable" and "legitimate safety concerns justified their on-the-spot decision to use intrusive methods to stabilize the situation further." *Id.* at 982.

Similarly, in the *Miles* case, the court the police approached the defendant with their weapons drawn, directed him to get down on his knees, and handcuffed him. *Miles,* 247 F.3d at 1013. When the officers arrived on scene, the defendant was the only man who matched the description of someone who had recently fired shots at a home. In addition, the man was near two other individuals, so the officers were outnumbered. *Id.* The court held this "intrusive and aggressive" conduct was justified by the officers "legitimate safety concerns." *Id.*

The PDRD footage presented to the Court shows that the stop was aggressive and intrusive. As in the *Edwards* and *Washington* cases, there were multiple officers on scene who pointed their weapons toward Mr. Johnson and ordered him to walk backwards. Officers then directed Mr. Johnson to kneel down and handcuffed him before they frisked him. *See Edwards*,

7

761 F.3d at 982; *see also United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982) ("[H]andcuffing substantially aggravates the intrusiveness of an otherwise routine investigatory detention and is not part of a typical *Terry* stop."). Based on the review of this footage, the Court concludes a reasonable person in Mr. Johnson's position would have felt that his liberty was restricted. Therefore, the Court turns to the issue of whether the officers' actions were reasonable and justified under the totality of the circumstances.

The record shows that although Mr. Johnson did question the officers about why he was being stopped, he complied with their commands. Further, while there are times when he lowers his arms, based on the Court's review of the PDRD footage, it does not look as if Mr. Johnson is attempting to prevent the discovery of any contraband. *See, e.g., United States v. Fontenot*, No. 10-CR-00778-RS, 2011 WL 634814, at *2 (N.D. Cal. Feb. 11, 2011). Nor does the Government put forth any evidence to suggest that the officers believed that to be the case.

In the *Fontenot* case, the court denied a motion to suppress where the officer responded to a report that a man in front of a liquor store had pulled out a gun. *Fontenot*, 2011 WL 634814, at *1, *3. Although there were other officers in the area, the officer was by himself when he approached the suspect, who was with two other men. *Id.*, 2011 WL 634814, at *2-3. The court found that it was reasonable for the officer to approach "with his weapon drawn and held in a low ready position" and order the men to raise their hands. When the defendant did not "comply fully," another officer briefly raised his rifle. The court determined that under the totality of the circumstances, the stop did not amount to a *de facto* arrest. *Id.*, 2011 WL 634814, at *3.

Although it is not published, in *United States v. Morris*, the court concluded a stop did "not exceed the bounds of a *Terry* stop," where the officers approached the defendant with guns drawn, ordered him to the ground, and handcuffed him. 417 Fed. Appx. 713, 714 (9th Cir. 2011). While the defendant was cooperative, the court noted that the officers "reasonably believed that [he] was armed," based on a 911 call, in which the caller stated that a man matching defendant's description "had just displayed a gun in a blue box he was carrying." *Id.* The defendant was carrying a cooler when he was stopped, and the court determined that "safety was an obvious concern given that he was thought to be carrying a gun." *Id.* at 715.

8

The Court finds the record shows the officers had a report that the man they were looking for was carrying a gun, which places this case in one of the special circumstances the Ninth Circuit has held can warrant the use of more aggressive and intrusive tactics. *Washington*, 98 F.3d at 1189; *see also United States v. Greene*, 783 F.2d 1364, 1367-68 (9th Cir. 1986) (use of aggressive tactics reasonable and justified where an informant reported to police she had seen a pistol in the defendants' motel room). In addition, Mr. Johnson was the only person in the vicinity who matched the description provided by S.J. and was in the area she said he would be located within a short time after she made the call.

There is no evidence that any of the officers on scene were told that S.J. reported the man she had seen had harassed her or threatened to kill her, which distinguishes the facts in this case from the facts in the *Edwards* and *Miles* cases, where officers were responding to an area where shots had been fired. The CAD report also indicates the officers were advised that the individual they were looking for was with a group of people. Although Mr. Johnson and Mr. Haley were the only two individuals near the deli, the PDRD footage shows officers asking bystanders to back up. Therefore, the Court concludes that although the number of officers exceeded the number of suspects, that fact does not render their conduct unreasonable under these circumstances. *Cf. Miles*, 247 F.3d at 1013 (proximity of other individuals raised concerns for those individuals' safety).

Having considered the totality of the circumstances, the Court concludes that the fact that the officers had a report of a man with a weapon, whom they had been told was with other individuals renders this case, as well as the fact that Mr. Johnson fit the specific description they had been provided, renders this case more analogous to the *Fontenot* and *Morrison* cases than to *Washington*. Accordingly, the Court concludes the officers' use of more aggressive tactics was reasonable under the circumstances and did not convert a *Terry* stop into an arrest that would require probable cause.

**2.       The Officers Had Reasonable Suspicion to Detain and Frisk Mr. Johnson.**

Mr. Johnson also argues the officers lacked reasonable suspicion to stop and subsequently frisk him. Under *Terry*, law enforcement officers may, consistent with the Fourth Amendment,

9

engage in brief investigatory stops if the officers have reasonable suspicion that an individual is engaged in criminal activity. 392 U.S. at 30. In order to justify a *Terry* frisk, an officer must have reasonable, articulable suspicion that the suspect "is armed and presently dangerous to the officers or to others." *Id.* at 24. "[T]he type of crime a person is suspected of committing may be highly relevant to the existence of reasonable suspicion for a weapons frisk." *Thomas v. Dillard*, 818 F.3d 864, 878 (9th Cir. 2016).

"Reasonable suspicion" exists where officers, based on the totality of the circumstances, have a "particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Although a "mere hunch" will not suffice, "the level of suspicion the standard requires is 'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less' than is necessary for probable cause." *Navarette v. California,* __ U.S. __, 134 S.Ct. 1683, 1687 (2014) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)); *see also United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (*en banc*). In this case, the alleged criminal activity known to the officers was the report of a man who reportedly had a gun on his person. Therefore, in this instance the justification for the stop and frisk overlap.

"The 'reasonable suspicion' necessary to justify [an investigatory] stop 'is dependent upon both the content of information possessed by police and its degree of reliability.'" *Navarette*, 134 S.Ct. at 1687 (quoting *Alabama v. White,* 496 U.S. 325, 330 (1990)). The Court must evaluates the totality of the circumstances in order to determine whether the officers had reasonable, articulable suspicion to believe Mr. Johnson was engaged in criminal activity. *Id.* The same is true for evaluating whether the officers had a reasonable suspicion to believe he was armed and dangerous. *Thomas*, 818 F.3d at 876.

Although there is no evidence in the record that the officers who stopped Mr. Johnson were aware of the threats he allegedly made to S.J., the dispatcher did convey that the suspect reportedly was carrying a weapon in his pants but that the reporting party had not seen all of the

10

gun.[8] Thus, the officers had a basis to believe Mr. Johnson was engaged in criminal activity.

Mr. Johnson argues, however, that the "tip" offered by S.J. was not sufficiently reliable. "[A]n anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity," but in some cases "an anonymous tip, suitably corroborated, exhibits 'sufficient indicial of reliability to provide reasonable suspicion to make [an] investigatory stop." *Florida v. J.L.*, 529 U.S. 266, 269 (2000) (quoting *Alabama v. White*, 496 U.S. 325, 327, 329 (1990)).

S.J. reported the incident by calling 911. In *Navarette,* the Supreme Court noted that "use of the 911 emergency system" is an "indicator of veracity" because it permits callers to be traced and identified. The system, therefore, "provide[s] some safeguards against making false reports with immunity." *Navarette,* 134 S.Ct. at 1689; *cf. J.L.*, 529 U.S. at 276 (Kennedy, J., concurring in judgment) ("If an informant places his [or her] anonymity at risk, a court can consider this factor in weighing the reliability of the tip."). In *Navarette*, the Supreme Court noted a number of other factors that a court may consider when determining whether a tip about criminal activity is sufficiently reliable to provide reasonable, articulable suspicion for an investigatory stop.

In that case, a woman called 911 and stated that a truck had run her off the road, provided the operator with a detailed description of the truck, including a license plate number, and advised the operator where the incident occurred. 134 S.Ct. at 1687. Officers responded to the vicinity less than ten minutes after dispatchers broadcast a description of the truck, saw a truck matching the description, and pulled it over to investigate whether the driver was intoxicated. The *Navarette* court held that "by reporting that she had been run off the road by a specific vehicle … the caller necessarily claimed eyewitness knowledge of the alleged dangerous driving. That basis of knowledge lends significant support to the tip's reliability. *Id.* at 1689; *see also Illinois v. Gates,* 462 U.S. 213, 234 (1983)) ("[An informant's] explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles [a] tip to greater weight than might otherwise be the case."). The *Navarette* court also concluded the totality of the circumstances provided reasonable suspicion to stop the truck because the police located the truck

---

[8] California Penal Code section 25400(a)(2) makes it unlawful to "carry concealed upon the person any pistol, revolver, or other firearm capable of being concealed upon the person."

11

shortly after the 911 call a short distance from where the driver reported she had been run off the road. The Court reasoned "[t]hat sort of contemporaneous report has long been treated as especially reliable" and noted that "the stress of excitement caused by a startling event" also weighed in favor of the caller's veracity. *Id.*

In contrast, in the *J.L.* case, the Supreme Court found an anonymous tip was not sufficiently reliable to support a *Terry* stop. 529 U.S. at 268. There, the police received an anonymous tip that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." *Id.* The call was not recorded, and the police had no information about the person who made the report. The informant also did not provide any information about how he knew the man had a gun. *Id.* at 271. The police reported to the scene shortly after the call and observed a man, the defendant, in a plaid shirt. The police did not see a firearm, and the men did not make "threatening or otherwise unusual movements." *Id.* at 269. The Court noted that the information provided by the informant about what the defendant was wearing and where he would be located was reliable information about the defendant's identity. It did not, however, provide reliable information about the alleged criminal activity. *Id.* at 271-72.

The Ninth Circuit distinguished the facts in *J.L.* in *United States v. Terry-Crespo* and found that a 911 call provided officers with reasonable suspicion to stop the defendant. 356 F.3d 1170 (9th Cir. 2004). In *Terry-Crespo*, the police received a 911 call from a man who stated that a man had just threatened him with a handgun, provided information about the man's ethnicity and what he was wearing. The caller also identified himself by name to the 911 operator but was unable to provide her with the number of the phone from which he was calling, because he had borrowed it. He also gave other information that suggested he did not want to be contacted by the police. *Id.* at 1172. The Ninth Circuit found the 911 call alone gave the police reasonable suspicion to stop the defendant, who matched the description on the 911 call. *Id.* at 1174. The court noted that the caller had provided his name and even if he could not be located, the call was not entirely anonymous. The court also distinguished the facts from the facts in *J.L.* on the basis that the call had been recorded. *Id.* at 1175. Those facts "jeopardized any anonymity" the caller may have had and added to the reliability of the tip. *Id.* at 1176. The *Terry-Crespo* court also

12

noted that the fact that "an emergency 911 call is entitled to greater reliability than an anonymous tip concerning general criminality." *Id.* As the Court has noted, it does not appear that the officers were aware that defendant allegedly threatened S.J., which distinguishes the facts in this case, in part, from the facts in *Terry-Crespo*.

S.J. apparently provided the operator with an incorrect telephone number. The Court does not find that fact dispositive. She did provide the 911 operator with her name and address, and the ALI system captured another phone number. "[H]aving a recorded telephone conversation risks the possibility that the police could trace the call or identify" a caller by their voice, which risks "any anonymity [they] might have enjoyed and" may expose a caller to legal sanction. *Terry-Crespo*, 356 F.3d at 1176.[9]

The facts in this case are distinguishable from the facts in *Navarette*, *Edwards*, and *Miles*, where the officers received information of a car that had run another car off the road or had information of recent shootings. Although the 911 call in this case demonstrates that there was some discussion between S.J. and the operator about where the gun was located, as in the *Terry-Crespo* case and unlike in the *J.L.* case, S.J. did provide an explanation as to how she knew that the man had a gun. Thus, she provided eyewitness information to show she knew of "concealed criminal activity." *J.L.*, 529 U.S. at 272; *cf. Edwards*, 761 F.3d at 985 (finding 911 call provided officers with reasonable suspicion to stop defendant, in part because "reporting party here had eyewitness knowledge of shooting"). The Court has listened to the 911 call, and it cannot say S.J.'s report is entirely lacking in credibility. In addition, S.J. did provide a detailed description of the man she had seen in terms of attire and physical traits, and Mr. Johnson was the only person on the scene who matched that description.

When the Court considers the totality of the circumstances, the Court concludes S.J.'s report to the 911 caller was sufficiently reliable to provide the officers with reasonable articulable suspicion that Mr. Johnson was concealing a weapon on his person. *Cf. Fontenot,* 2011 WL 634814, at *5-6.

---

[9] While she chose not to come back to the scene, the Court does not find that fact necessarily undermines the reliability of her report. *Cf. Terry-Crespo*, 356 F.3d at 1176.

**CONCLUSION**

For the foregoing reasons, the Court DENIES Mr. Johnson's motion to suppress. The parties shall appear on June 12, 2018 at 1:00 p.m. for a status conference. If the parties believe the time between this ruling and June 12, 2018 may be excluded from the Speedy Trial Act, they shall submit a stipulation and proposed order documenting the basis for the exclusion of time.

**IT IS SO ORDERED.**

Dated: June 8, 2018

_____
JEFFREY S. WHITE
United States District Judge